# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MARIO JALBERT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **TIMOTHY GRAUTSKI, individually and** ) | **Civil Action No.** |
| **d/b/a ADD-A-SIGN, ROGERS PRINTING,** ) | **06-40040-FDS** |
| **LARRY SWIHART, individually and d/b/a** ) | |
| **F & M TOWING SERVICE, NORMAN** ) | |
| **CAMIRE, and LISA LeBLANC,** ) | |
| ) | |
| **Defendants.** ) | |

# MEMORANDUM AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action for copyright infringement arising out of the unauthorized use of a

graphic design for a sports print.  Plaintiff Mario Jalbert, a graphic designer and artist, alleges that

defendants Timothy Grautski, individually and d/b/a Add-A-Sign; Rogers Printing; Larry Swihart,

individually and d/b/a F&M Towing Service; Norman Camire; and Lisa LeBlanc unlawfully

misappropriated a design created by Jalbert.  The design, which Jalbert calls "Boston Sports

Print," consists of a drawing of the word "Boston" spelled out by individuals wearing local

professional sports uniforms, such as the Red Sox and Patriots.  The unauthorized use arose when

Jalbert took the design to Rogers Printing and Add-A-Sign for printing and mounting, which

resulted in the creation of copies that were allegedly misappropriated.

The amended complaint alleges copyright infringement under 17 U.S.C. § 101 against all

defendants (Count One), unfair competition under 15 U.S.C. § 1125(a) against all defendants

(Count Two), common law conversion against all defendants (Count Three), unfair and deceptive trade practices under Mass. Gen. L. ch. 93A against Swihart, Grautski, and Rogers Printing (Count Four), and negligent supervision against Swihart and Grautski (Count Five).[1]

Plaintiff has moved for partial summary judgment as to Count One with respect to certain acts of allegedly unauthorized distribution, and for summary judgment as to all claims against Swihart.  Defendants Grautski, Rogers Printing, LeBlanc, and Swihart have cross-moved for summary judgment as to all claims.

For the following reasons, summary judgment will be granted in part and denied in part.

## I.    Statement of Facts

The following facts are undisputed unless otherwise noted.

### A.    Parties

Plaintiff Mario Jalbert is a graphic designer and artist.  Jalbert created the "Boston Sports Print," an original piece of artwork that depicts figures in local sports uniforms representing each letter in the word "Boston."

Defendant Rogers Printing, a Massachusetts corporation, is a printing business located in Leominster, Massachusetts.  Rogers employs seven people.  David Lynch is the president of Rogers.  Defendant Lisa LeBlanc is the customer service representative for the company.

Defendant Add-A-Sign is a sole proprietorship located in Leominster, Massachusetts. Add-A-Sign primarily makes banners and flags and applies lettering to trucks.  Defendant Timothy Grautski owns and operates the company.

---

[1] Both Add-A-Sign and F&M Towing are sole proprietorships, owned and operated by defendants Timothy Grautski and Larry Swihart, respectively.  For the sake of simplicity, this opinion will simply refer to the defendants as Grautski or Swihart unless otherwise indicated.

Defendant F&M Towing Service is a sole proprietorship located in Westminster, Massachusetts, that tows motor vehicles.  Defendant Larry Swihart owns and operates the company.

Defendant Norman Camire was employed by Add-A-Sign in the spring and summer of 2005 as a sign installer.  At the same time, Camire was also employed by F&M Towing as a tow truck operator.[2]

### B. Printing the "Boston Sports Print"

In May or June 2004, Mario Jalbert and his mother engaged Add-A-Sign to make a small number of prints of his Boston Sports Print.[3]  Jalbert gave Add-A-Sign an electronic copy of the Boston Sports Print to make prints from and gave it permission to retain the electronic copy for potential future print jobs.  Jalbert had previously registered the copyright for the print and the print displayed a copyright mark.

Later in the summer of 2004, Jalbert asked Add-A-Sign to produce 1,000 copies of the print.  Add-A-Sign was unable to produce that many prints efficiently, so Grautski recommended that Jalbert use the services of Rogers Printing instead.  Jalbert then placed an order for 1,000 prints with Rogers and paid for that order in full.

### C. LeBlanc's Copy of the Print

Lisa LeBlanc, a Rogers Printing employee, saw a copy of the print and liked it, and thought that her young son would also like it.  During the production of the 1,000 copies of

---

[2] Camire did not respond to the complaint and was defaulted on November 7, 2006.

[3] It is undisputed that Jalbert's mother acted in an agency capacity for Jalbert in the course of dealing with Add-A-Sign and Rogers Printing and their employees.

Jalbert's print, LeBlanc asked David Lynch, the owner of Rogers Printing, if she could have a copy of the print.  Lynch gave LeBlanc an overrun print from the production run.[4]  She took it home and hung it on the wall in her son's room.

LeBlanc told Jalbert's mother, who did some work on behalf of Jalbert, that she had kept a copy of the print for use in her home.  Mrs. Jalbert did not tell her that the print was copyrighted and did not request that she return the copy.  Instead, Mrs. Jalbert told her that she hoped her son liked the print and told his friends about it.[5]

Several months later, LeBlanc received a letter from Jalbert's counsel alleging that she likely had infringed Jalbert's copyright and instructing her to return the print.  LeBlanc called Jalbert's counsel in response to the letter and acknowledged that she had a copy of the print.  The attorney recommended that LeBlanc get her own legal counsel, but she responded that she could not afford counsel and had nothing to hide.  LeBlanc then spoke with Timothy Grautski of Add-A-Sign and David Lynch about the letter.  After these conversations, LeBlanc threw away the only copy of the print she had in her possession.

D.   **Mounting and Laminating the Print**

When Jalbert ordered 1,000 copies of the print from Rogers Printing in the summer of 2004, he asked Rogers to have Add-A-Sign mount 200 of the prints on foam core.  Jalbert also asked that 100 of the 200 mounted prints be laminated.  He instructed Rogers to transfer the prints to Add-A-Sign for that purpose.

---

[4] An overrun is an extra sheet printed during a production run.

[5] There is no contradictory testimony in the record.  Jalbert testified only that his mother told him at some point about LeBlanc having a copy of the print from an overrun at Rogers Printing.

In August 2004, Timothy Grautski picked up 295 or 300 prints from Rogers in order to complete the mounting and laminating job.[6]  Grautski took the extra 95 or 100 prints because some were likely to be wasted during the lamination process.  Jalbert contends that Grautski was only authorized to take 200 prints, not the 295 or 300 that he took from Rogers.  Grautski, however, contends that Jalbert told him that he should take some extra prints and keep them in case Jalbert needed additional prints in the future.

Add-A-Sign completed the mounting and lamination as requested.  Grautski stored the remaining extra prints on a shelf in the Add-A-Sign office.  Grautski testified that approximately ten prints were wasted during the mounting and laminating process, which left between 85 and 90 extra prints at Add-A-Sign.

### E.    Copies at Add-A-Sign

In May 2005, Timothy Grautski was ordered to vacate the premises that Add-A-Sign had been leasing because of concern over the structural stability of the building.  Grautski was given two days' notice of the forced relocation.  The contents of Add-A-Sign's shop were placed in boxes, without conducting an inventory, and transported in personal vehicles and rented trucks to a new location.  Norman Camire's truck was one of the vehicles used for the move.

As noted, prior to the relocation, the extra prints were being stored on a shelf in Add-A-Sign's office.  Grautski did not see who, if anyone, removed the prints from the shelf at the time of the move.  It is not disputed, however, that Camire took at least some of the prints.[7]

---

[6] Rogers Printing stored the 700 or so remaining copies of the print until Jalbert picked them up the following year.

[7] After Grautski received a letter from plaintiff's counsel threatening a copyright infringement lawsuit, Grautski asked Camire about the incident.  Camire admitted to taking copies of the print to F&M Towing.  According to Grautski, Camire told him that he had taken 10 to 15 copies of the print from Add-A-Sign because he

About a month after the move to the new location, in June 2005, Grautski received a letter from Jalbert's counsel regarding the extra copies of the print.  In response to the letter, he conducted a search of both the old and new Add-A-Sign locations, but was unable to find any copies of the print.  Grautski then asked the Add-A-Sign employees, including Camire, to return any copies of the print they may have taken.  Camire returned 18 copies of the print to Grautski, who gave them to Jalbert.

### F.      Additional Copies Produced During Discovery

During discovery in this case, Robert White—counsel for Grautski, Rogers Printing, and LeBlanc—produced to plaintiff additional copies of the Boston Sports Print that had been in his clients' possession.[8]  Apparently, at Mario Jalbert's deposition, Mr. White produced 24 additional copies of the print, which were marked as exhibits at the deposition:  Exs. 15 and 17-21 were copies of the print mounted on foam core; Exs. 22-35 were copies that had crop marks; Ex. 36 was a copy without crop marks; and Exs. 37-39 were copies that had both color bars and crop marks.[9]  Based on the production of these additional copies of the print, plaintiff contends that at least 15 copies were "pirated" by Rogers Printing and Add-A-Sign, in addition to the 95 copies

thought the "guys at F&M Towing would think they [were] cool."

[8] The record is not clear as to which of Mr. White's clients had copies of the print in his or her possession, or how many prints there were.  Grautski testified that after his initial, unsuccessful search, he later discovered six mounted prints at Add-A-Sign, which he turned over to Mr. White.  Plaintiff accuses Mr. White of spoliating the evidence by commingling the copies without maintaining an evidence log.  It is not necessary to decide the spoliation issue at the present time.

[9] The parties disagree as to the exact number of prints that remain unaccounted for, but the number appears to be somewhere between 40 and 60 prints.

alleged to have been distributed by Rogers Printing to Add-A-Sign without authorization.[10]

### G.    Copies at F&M Towing

In July 2005, Swihart observed approximately 12 to 15 copies of the Boston Sports Print draped over the safe in his office at F&M Towing.  Later that day, Swihart saw that the prints had been moved to a shelf outside his office.  Swihart further contends that later that same day he noticed that the prints appeared to have been taken away from the premises.  Andrew Mosco, an employee of F&M Towing, contends that the prints were on the F&M premises for more than a day.[11]

At some point, Samantha LeBlanc, a friend of Jalbert's, went to F&M Towing to visit Mosco and saw the copies of the print.  She took one copy with her when she left.  She later informed Jalbert that she had seen copies of the print at F&M Towing.

Swihart later learned that Camire had taken the copies of the print from Add-A-Sign, where Camire was also employed, and brought them to F&M Towing.  Swihart did not know what the copies of the print were for, did not know that the print was copyrighted material, and did not know why Camire brought the copies to F&M Towing.  Swihart did not move or otherwise touch the prints, and did not authorize or request Camire to bring them to F&M Towing.

---

[10] Plaintiff does not explain how he determined that 15 was the minimum number of additional copies allegedly pirated by Rogers Printing and Add-A-Sign.  There is no other information in the record concerning the provenance of these additional prints.

[11] According to Mosco, the stack of prints was about an inch thick.  He testified that the prints were at F&M Towing for more than a week or two, but less than six months.  However, Mosco also testified that he was guessing about the time line.  Mosco was certain, however, that he never gave a copy of the print out to anyone who had come into F&M Towing.

Swihart contends that neither his office nor the area outside his office, where the prints had been located, were open to the public. Jalbert, however, contends that these areas were accessed by Samantha LeBlanc, who was not employed by F&M Towing, so they must have been publicly accessible.

## II.    Procedural History

On March 1, 2006, plaintiff filed the present action. The amended complaint asserts the following five claims: Count One—copyright infringement against all defendants (17 U.S.C. § 101); Count Two—unfair competition against all defendants (15 U.S.C. § 1125(a)); Count Three—common law conversion against all defendants; Count Four—unfair and deceptive trade practices against F&M Towing, Add-A-Sign, and Rogers Printing (Mass. Gen. L. ch. 93A); and Count Five—negligent supervision against F&M Towing and Add-A-Sign.

Plaintiff has moved for partial summary judgment on Count One, and has separately moved for summary judgment with respect to all claims against Swihart. Defendant Swihart has moved for summary judgment on all claims against him. Defendants Grautski, Rogers Printing, and LeBlanc have moved for partial summary judgment as to Count One and have separately moved for summary judgment on the remaining counts. Those five motions are pending before the Court.

## III.   Analysis

### A.    Standard of Proof

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation and citations omitted). Summary judgment is appropriate

when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted).  A material fact is one that has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996) (internal quotation and citations omitted).

### B.   Count One—Violation of 17 U.S.C. § 101 *et seq.*

Count One alleges that each defendant directly, vicariously, or contributorily infringed plaintiff's copyright in the Boston Sports Print.[12]  A plaintiff alleging copyright infringement must prove two elements:  (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.  *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005) (*quoting Feist Publications, Inc., v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)).  The parties agree that plaintiff owned a valid copyright in the print, so the issue is whether defendants made an unauthorized "copying" of the print.

For the purposes of federal copyright law, "[c]opying is a shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106 . . . ." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291 (3d Cir. 1991) (internal

---

[12] While it is not altogether clear from the complaint, plaintiff seems to allege both vicarious and contributory liability in addition to his direct liability claims.  *Compare* Complaint at ¶ 31 ("[E]ach [defendant] has, individually, corporately, jointly, severally and in contribution, [has] interfered in the Plaintiff's copyright rights.") *with* ¶ 33 ("As a result of the direct and vicarious violations of this statute, the Plaintiff has been harmed.").  Accordingly, the Court will address both vicarious and contributory liability where applicable.

quotation and citation omitted).  Pursuant to 17 U.S.C. § 106(3), the holder of a valid federal

copyright has the exclusive right to distribute the work to the public.[13]  It is a violation of that

right, and therefore copyright infringement, "to distribute copies . . . of the copyrighted work to

the public by sale or other transfer of ownership, or by rental, lease, or lending," without

authorization.  17 U.S.C. § 106(3).  Intent is not an element of copyright infringement.  *See* 17

U.S.C. § 501.

      In addition to direct infringement, one can be found vicariously liable for copyright

infringement.  The Second Circuit articulated what has become the acknowledged standard for a

finding of vicarious liability in the context of copyright infringement:

> When the right and ability to supervise coalesce with an obvious and direct
> financial interest in the exploitation of copyrighted materials—even in the absence
> of actual knowledge that the copyright monopoly is being impaired—the purpose
> of copyright law may be best effectuated by the imposition of liability upon the
> beneficiary of that exploitation.

*Shapiro, Bernstein & Co., v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) (internal citation

omitted); *see also Polygram Int'l Publ'g, Inc., v. Nevada/TIG, Inc.,* 855 F. Supp. 1314, 1324 (D.

Mass. 1994).  In short, to find a defendant vicariously liable for another's copyright infringement,

the Court must find that the defendant had (1) the right and ability to supervise the infringing

activity, and (2) a direct financial interest in the exploitation of copyrighted materials.  *See, e.g.,*

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)

(internal citations omitted); *Rosenthal v. MPC Computers, LLC*, 493 F. Supp. 2d 182, 194 (D.

Mass. 2007) (internal citations omitted).

---

    [13] In addition to the right to distribute, the statute also establishes the copyright owner's rights to
reproduce the copyrighted work; to prepare derivative works; with respect to particular types of works, to perform
them publicly; and to display the copyrighted works publicly.  17 U.S.C. § 106.  Plaintiff claims only violations of
his distribution right.

A defendant can also be found contributorily liable for copyright infringement. Specifically, a party "who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin*, 443 F.2d at 1162.  The Supreme Court has stated that contributory liability "may be predicated on actively encouraging (or inducing) infringement through specific acts . . . ." *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*, 545 U.S. 913, 942 (2005).  Although the defendant must have knowledge of the infringing activity, "the defendant need only have known of the direct infringer's activities, and need not have reached the legal conclusion that those activities infringed a copyrighted work."  Paul Goldstein, GOLDSTEIN ON COPYRIGHT, § 8.1 n. 1 (2005); *see also Sony*, 464 U.S. at 489 ("Nor is it necessary that the defendant be aware that the infringing activity violates the copyright laws.").

### 1.      The Transfer from Rogers Printing to Lisa LeBlanc

Plaintiff contends that Rogers Printing and Lisa LeBlanc willfully infringed his copyright when LeBlanc was permitted to take a single overrun copy of the print home with her to hang in her son's room.

### a.      Liability of Rogers Printing

The first issue is whether Rogers Printing can be liable for the transfer to Lisa LeBlanc. Lisa LeBlanc asked her boss at Rogers Printing, David Lynch, whether she could take an overrun copy of Jalbert's print, and he permitted her to do so.  LeBlanc hung the print on the wall in her son's room.

Section 106(3) gives a copyright owner the exclusive right to "distribute copies . . . of the copyrighted work *to the public* by sale or other transfer of ownership."  17 U.S.C. § 106

(emphasis added). The phrase "distribute . . . to the public" is not defined in the Copyright Act, but "'[p]ublication' and the exclusive right protected by section 106(3) . . . are for all practical purposes, synonymous." *Ford*, 930 F.2d at 299. The statutory definition of "publication" is "the distribution of copies . . . of a work to the public by sale or other transfer of ownership." 17 U.S.C. § 101.

A gift of copyrighted material can implicate § 106, because "the term 'other transfer of ownership' is broad enough to encompass gifts." *Ford*, 930 F.2d at 299. Further, "even one person can be the public for the purposes of section 106(3)." *Id.; see also Burke v. National Broad. Co.*, 598 F.2d 688, 691 (1st Cir. 1979) (addressing common law copyright; publication can be found "where only one copy of the work passes to a member of the general public").[14]

Rogers contends, however, that it made only a "limited publication" of the print when it transferred a copy to LeBlanc to take home "for her own limited purpose." Under the "limited publication" doctrine, a person can communicate the contents of a work to a "definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution, or sale," without "distributing" it to the "public." *RPM Mgmt., Inc. v. Apple*, 943 F. Supp. 837, 841 (S.D. Ohio 1996); *see also Burke*, 598 F.2d at 691. The restrictions on the purpose can be implied as well as express. *Burke*, 598 F.2d at 692. A "general publication," on the other hand,

---

[14] In *Ford Motor Co.*, the Third Circuit noted that

> because "publication" and the right protected by section 106(3) are the same, and because a "publication" can occur when only one member of the public receives a copyrighted work, it follows that a violation of section 106(3) can also occur when illicit copies of a copyrighted work are only distributed to one person. Obviously, in such a situation, damages may be limited, or even non-existent, but the liability for infringement remains.

930 F.2d at 300.

"occurs when a work is made available to members of the public regardless of who they are or what they do with it." *Acad. of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451-52 (9th Cir. 1991) (*citing Burke*, 598 F.2d at 691)).[15]  In other words, a distribution to one person can constitute a distribution to the "public" in violation of § 106(3), but not if it was made only for a limited purpose, and without the right to diffuse, reproduce, distribute, or sell the work.

Here, there is no dispute that Rogers distributed the print to a single individual.  Based on the record before the Court, it is unclear whether that distribution was made for a limited purpose without the right to reproduce, distribute, or sell it.  Accordingly, the Court will deny plaintiff's and defendants' cross-motions as to the copyright infringement claim against Rogers Printing for distributing the print to Lisa LeBlanc.

### b.    Liability of Lisa LeBlanc

The next issue is whether LeBlanc is likewise potentially liable for infringement for asking for an overrun copy, taking it, and hanging it in her son's room.  LeBlanc testified that Jalbert's mother—who acted as his agent in the course of dealing with Rogers Printing—knew about and did not object to her possession of an overrun copy of the print.  Specifically, LeBlanc contends that after hearing that she had taken a print home, Mrs. Jalbert told her that she hoped her son liked the print and told his friends about it.  Those facts have not been disputed by plaintiff.

---

[15] The "limited publication" doctrine is derived from the common law.  Notwithstanding the fact that the Copyright Act of 1976 abolished common law copyright as a general matter, courts continue to apply the limited publication doctrine when analyzing whether a work has been "published" or "distributed to the public."  *See RPM Mgmt., Inc.*, 943 F. Supp. at 841; *Williams v. Arndt*, 626 F. Supp. 571, 578 (D. Mass. 1985).

Anyone who is "authorized by the copyright owner to use the copyrighted work in a way specified in [17 U.S.C. § 106 *et seq.*] . . . is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984).   Under Massachusetts law, if an agent has the apparent authority to authorize something and a third-party reasonably relies on that authorization, the third-party may hold the principal to the consequences of such reliance.   *See Binkley Co. v. Eastern Tank, Inc.*, 831 F.2d 333, 337-38 (1st Cir. 1987); RESTATEMENT (THIRD) OF AGENCY, § 2.03 (2006) ("Apparent authority is the power held by an agent . . . to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").   Because Jalbert, through his agent, authorized Leblanc's possession of the print, Leblanc did not infringe his copyright.   *See Sony*, 464 U.S. at 433.[16]

Alternatively, Jalbert waived his right to pursue an infringement action against LeBlanc.   A copyright holder can waive an infringement claim by acting in a way that can be "construed as a relinquishment of [his] rights under the Copyright Act."   *Dream Dealers Music v. Parker*, 924 F. Supp. 1146, 1152 (S.D. Ala. 1996).   "Waiver may occur by an express and affirmative act, or may be inferred by a party's conduct, where the conduct is consistent with and indicative of an intent to relinquish voluntarily a particular right such that no other reasonable explanation of the conduct is possible."   *KACT, Inc., v. Rubin*, 62 Mass. App. Ct. 689, 695 (2004); *see also Irons v. F.B.I*, 880 F.2d 1446, 1452 (1st Cir. 1989) ("Courts sometimes *infer* from an individual's statements or conduct that the individual wishes to forego a protection.").   It is undisputed that Jalbert's mother

---

[16] Because Lisa Leblanc was authorized to possess the print, she was legally permitted to dispose of the print as well. *See* 17 U.S.C. § 109(a) ("Notwithstanding . . . [§ ]106(3), the owner of a particular copy . . . lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . .").

14

not only did not tell LeBlanc that she had done anything wrong, but that she hoped LeBlanc's son enjoyed the print and told his friends about it. The only reasonable inference from Mrs. Jalbert's conduct is that she approved of LeBlanc's actions, and intended to waive any claim Jalbert may have had against LeBlanc for taking the print home.

Accordingly, the Court will grant summary judgment in LeBlanc's favor as to the claim of copyright infringement.

### 2.   The Transfer from Rogers Printing to Add-A-Sign

Jalbert (or his mother, acting as his agent) authorized Rogers Printing to make 1,000 copies of the print and coordinate with Add-A-Sign to mount and/or laminate 200 of those copies. Timothy Grautski asked Rogers Printing to give him 295 or 300 prints, instead of just 200, because some were likely to be wasted during the lamination process. Plaintiff appears to concede that Rogers had the authority to transfer 200 prints to Add-A-Sign, but contends Rogers did not have the authority to transfer any additional copies.

### a.   Liability of Rogers Printing

The liability of Rogers Printing for the distribution to Add-A-Sign turns principally on the scope of its authority to transfer 95 to 100 additional copies of the print to Add-A-Sign. The authority of a party to reproduce or distribute a copyrighted work may be express or implicit. Here, the parties dispute both the nature of the express instructions given by Jalbert and the reasonable implications of those instructions.[17] Those disputes are plainly material, and

---

[17] The mere production or transfer of extra copies does not, by itself, raise copyright infringement concerns. A printer normally has implied authority to make extra copies (such as test copies or overruns) in the course of performing a job for a customer, unless the customer instructs to the contrary. Likewise, a company engaged in the business of mounting and laminating prints could be reasonably expected to require additional copies to account for error, waste, or other problems in the production process. Nonetheless, implicit in that grant of authority is a further limitation: that the extra prints will be destroyed, returned to the customer, or held for a

accordingly the Court will deny plaintiff's and defendants' cross-motions as to the copyright infringement claim against Rogers Printing for distributing the print to Grautski.[18]

### b.      Liability of Timothy Grautski d/b/a Add-A-Sign

A similar analysis applies to the liability of Grautski for the transfer from Rogers Printing. Grautski contends that he took the extra prints because some were likely to be wasted during the mounting and lamination process and because he had an understanding with Jalbert that he should take extra prints and hold onto them in case Jalbert needed any in the future.  As noted, the parties do not dispute that Rogers transferred 95 to 100 extra prints to Add-A-Sign, but rather whether the transfer of the extra prints was expressly or implicitly authorized.

Accordingly, the Court will deny plaintiff's and defendants' cross-motions as to the copyright infringement claim against Grautski arising out of the distribution to Add-A-Sign.

### 3.      The Transfer from Add-A-Sign to F&M Towing

Plaintiff contends that Grautski and Swihart are liable for infringement for the transfer of the prints from Add-A-Sign to F&M Towing and any subsequent misappropriation.  As noted, after completing the mounting and laminating job, Grautski maintained approximately 80 to 95 extra prints in the Add-A-Sign office.  Apparently during the company's relocation, Camire took some or all of the extra prints, without Grautski's authorization, and brought them to his other

---

reasonable period of time awaiting further instructions.  Furthermore, a customer's express instructions will override any implied authority to the contrary.

[18] In addition, the Court must consider whether the "limited publication" doctrine applies to the distribution of the print by Rogers to Add-A-Sign.  *See RPM Mgmt., Inc.*, 943 F. Supp. at 841; *Williams*, 626 F. Supp. at 578.  It is undisputed that Rogers distributed the work to a limited group—Grautski—but it is not clear from the record whether that distribution was accompanied by implicit or explicit limitations regarding the purpose of the distribution (e.g., the transfer was solely to permit mounting and/or laminating of the prints).

place of employment, F&M Towing.  At least some of the prints appear to have been taken by unknown parties from F&M Towing.

### a.    Liability of Timothy Grautski

Plaintiff has offered no evidence to support his contention that Grautski directly infringed his copyright when Camire took the prints from Add-A-Sign; Grautski had no active role in Camire's infringing activities.  The question remains, however, whether Grautski can be liable for vicarious or contributory infringement.

To find a defendant vicariously liable for another's copyright infringement, the Court must find that the defendant had (1) the right and ability to supervise the infringing activity, and (2) a direct financial interest in the exploitation of copyrighted materials.  *See, e.g., Gershwin*, 443 F.2d at 1162; *Rosenthal*, 493 F. Supp. 2d at 194.

Here, Grautski did not have the right and ability to supervise Camire in his infringing activity—namely, taking the prints from Add-A-Sign and allegedly distributing them from another location.  Camire was clearly acting outside of the scope of his employment when he appropriated the prints in the course of the move and took them to F&M Towing.[19]  Furthermore, Grautski had no financial interest in Camire's exploitation of the copyrighted materials.  There is no evidence that Grautski profited, or could have profited, from Camire's alleged copyright infringement.  Accordingly, Grautski cannot be found to be vicariously liable for Camire's infringing activities.

---

[19] "Under Massachusetts law, conduct of an employee is within the scope of his or her employment if (1) it is of the kind he or she is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is motivated, at least in part, by a purpose to serve the employer." *McIntyre v. United States*, 447 F. Supp. 2d 54, 108 (D. Mass. 2006) (internal citations omitted); *see also Clickner v. City of Lowell*, 422 Mass. 539, 542 (1996).  While Camire's act of moving the prints from Add-A-Sign's old location to the new location may have been motivated by a purpose to serve his employer, his intervening act of stealing the prints certainly was not.

Although it is not entirely clear, plaintiff also seems to contend that Grautski should be found contributorily liable for copyright infringement. As noted, a defendant can be found to have contributorily infringed a copyright if that defendant knew of the infringing conduct of another and induced, caused, or materially contributed to that conduct. *See Gershwin*, 443 F.2d at 1162.

There is no evidence that Grautski had *actual* knowledge of Camire's alleged infringing activity. Plaintiff seems to argue that Grautski was willfully blind to Camire's activities, and therefore should be deemed to have had knowledge of that infringement. "Willful blindness is knowledge, in copyright law as it is in the law generally." *In re Aimster Copyright Litig.,* 334 F.3d 643, 650 (7th Cir. 2003) (internal citations omitted). There is not sufficient evidence, however, to sustain a claim of contributory infringement based on a theory of willful blindness. At most, Grautski (1) stored extra copies of the print in his facility, (2) permitted Camire to transport them when the facility was moved, and (3) failed to notice that Camire had taken them during the move. There is no evidence, however, that Camire used the facilities of Add-A-Sign to distribute the prints, or offered the prints to the public from that location. That is not enough to show willful blindness to acts of copyright infringement.

In any event, mere knowledge, even knowledge based on willful blindness, is not sufficient to show contributory infringement. Proof of contributory infringement also requires proof that a person induced, caused or materially contributed to the infringing conduct of another. *See Lifetime Homes, Inc. v. Residential Dev. Corp.*, 510 F. Supp. 2d 794, 808 (M.D. Fla. 2007). Knowingly providing the site and facilities for infringing activities can be enough, when coupled with a failure to stop specific instances of infringement once knowledge of the infringing activity is acquired. *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster Ltd.*, 380 F.3d 1154, 1163 (9th Cir.

18

2004), *vacated on other grounds by* 545 U.S. 1032 (2004); *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).  But there is no evidence that Grautski provided a facility for infringing activity, even assuming he somehow was aware of it.  Camire did not sell or give away the prints from the premises of Add-A-Sign, or engage in any other actions that might have triggered an obligation on the part of Grautski to demand that his activities stop.

Accordingly, summary judgment will enter in favor of Grautski as to the claim of copyright infringement based on the transfer of prints to F&M Towing.

### b.    Liability of Larry Swihart

After Camire took the prints from Add-A-Sign, he brought them to F&M Towing, his other place of employment.  Plaintiff contends that Camire intended to distribute the prints from F&M Towing and the fact that there are still prints unaccounted for supports the conclusion that the prints were actually distributed.  Plaintiff also contends that Swihart was willfully blind to what the prints were or what they were doing at F&M Towing.  Plaintiff has offered no evidence of direct copyright infringement by Swihart, but again appears to be proceeding on a claim of vicarious or contributory infringement.

The claim for vicarious infringement against Swihart is based on the fact that Camire was employed by F&M Towing as a tow truck operator.  It is obvious that Camire was not acting within the scope of his employment at F&M Towing when he took the prints from Add-A-Sign, where he was also employed.  It is highly doubtful whether he was so acting when he brought the prints to F&M Towing and left them there for some period of time, although Swihart clearly had the right to ask what the materials were and to ask Camire to remove them.  In any event, there is no evidence that Swihart received, or had any possibility of receiving, any financial benefit from

19

Camire's infringing actions, or had any financial interest in the exploitation of the copyrighted print.  Swihart therefore cannot be found to be vicariously liable for any copyright infringement committed by Camire.

Although it is not entirely clear, plaintiff also seems to contend that Swihart should be held liable on a theory of contributory infringement.  Again, a defendant can be found to have contributorily infringed a copyright if that defendant knew of the infringing activity and induced, caused, or materially contributed to the infringing conduct of another.  *See Gershwin*, 443 F.2d at 1162.  There is no evidence that Swihart had actual knowledge of any infringing activity; as with the claim against Grautski, proof of knowledge could be premised only on a willful blindness theory.  The evidence, viewed in the light most favorable to the plaintiff, is that (1) there was a pile of the prints, possibly as much as an inch thick, at F&M Towing, (2) the pile was in a publicly-accessible place, and (3) the pile was there for a period of time lasting more than a week or two but less than six months.  Even assuming that Swihart was willfully blind to the presence of the copyrighted materials, it does not follow that he was likewise willfully blind to their distribution to the public.

Furthermore, and in any event, there is no evidence that Swihart induced, caused, or materially contributed to Camire's alleged infringing conduct.  Swihart had no interaction with Camire concerning these alleged infringing activities, and did nothing to encourage, promote, or facilitate the infringement.  Mere passive inaction, without more, is not enough to support a claim of contributory infringement.

Accordingly, summary judgment will be granted in favor of Swihart as to the claim for copyright infringement.

C.      __Count Two—Violation of 15 U.S.C. § 1125(a)__

Count Two alleges that each defendant violated the "false designations of origin, false descriptions, and dilution forbidden" section of the Lanham Act, 15 U.S.C. § 1125(a).  In relevant part, § 1125(a) states as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representations of fact, which –
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The specific nature of this claim is unclear; plaintiff merely contends that "if the Court were to find that Jalbert did not have a lawful copyright, the Court could enter judgment under the Lanham Act on the grounds that commercial printing companies, by distributing Jalbert's work without authorization, constituted false designation of origin by a commercial competitor (the printer) . . . ."  (Memo in Opp. to Defendants' Cross Motion for SJ, at 18).

Plaintiff has presented no evidence or argument to support his false designation of origin claim that differs from that presented in support of his copyright claim.  Because the Lanham Act claim is simply a copyright infringement claim in different clothing, it is duplicative of the copyright claim and should be dismissed.  *See, e.g., Lipton v. Nature Co.,* 71 F.3d 464, 473 (2d Cir. 1995) (rejecting attempt to "convert all copyright claims into Lanham Act violations")

(internal quotation and citation omitted); *Shaw v. Lindheim*, 919 F.2d 1353, 1364-65 (9th Cir.

1990) (declining to expand Lanham Act to cases in which copyright provides adequate remedy);

*Mist-On Sys., Inc., v. Gilley's European Tan Spa*, 303 F. Supp. 2d 974, 981 (W.D. Wis. 2002);

*Natkin v. Winfrey,* 111 F. Supp. 2d 1003, 1013-1014 (N.D. Ill. 2000); *Weber v. Geffen Records,*

*Inc.*, 63 F. Supp. 2d 458, 464 (S.D.N.Y. 1999) ("Just as plaintiff's state claims are preempted for

their lack of any ["extra element" beyond those tracing to any copyright], plaintiff's Lanham Act

claim is impermissible because it would essentially duplicate a Copyright Act claim.")*; Mitchell*

*Int'l, Inc., v. Fraticelli*, No. 03-1031, 2007 WL 4197583, at *12 (D.P.R. Nov. 26, 2007)

("Where a plaintiff's Lanham Act claim merely alleges that the defendant made unauthorized use

of a copyrighted work, the Lanham Act claim will be dismissed as duplicative of the copyright

claim.") (internal citation omitted).

Accordingly, the Court will grant summary judgment in defendants' favor as to Count

Two.

### D.      Count Three—Common Law Conversion

Count Three alleges that each defendant committed common law conversion by

converting the "plaintiff's name, reputation, goodwill, income, and other assets . . . ."

(Complaint, ¶ 37).  Under Massachusetts law, "[c]onversion requires the exercise of dominion or

control over the personal property of another."  *Third Nat'l Bank of Hampden County v.*

*Continental Ins. Co.*, 388 Mass. 240, 244 (1983).  The plaintiff must have had a present legal

right to immediate possession of the property.  *Marshall Vessels, Inc., v. Wright*, 331 Mass. 487,

489 (1954).

22

A state-law cause of action is preempted under the Copyright Act if it does not require an element beyond "mere copying, preparation of derivative works, performance, distribution, or display." *Santa-Rosa v. Combo Records*, 471 F.3d 224, 226 (1st Cir. 2006) (internal quotation and citation omitted).  More specifically, claims are preempted if the following two conditions are met:  (1) the work of authorship in which rights are claimed must fall within the subject matter of copyright as defined by §§ 102 and 103; and (2) the state-created right must be equivalent to one of the exclusive rights created by the Copyright Act.  *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 505 (D. Mass. 1992), *aff'd* 36 F.3d 1147 (1st Cir. 1994) (internal citations omitted).  "When considering whether the right provided by a state-law claim is equivalent to that provided by the Copyright Act, courts focus on 'what plaintiff seeks to protect.'  If the plaintiff's state-law claim seeks to protect a matter within the scope of copyright law, the claim is preempted."  *Henry v. Nat'l Geographic Soc'y and NGE, Inc.*, 147 F. Supp. 2d 16, 20-21 (D. Mass. 2001) (internal citations omitted).

There is no disputing that plaintiff's print is subject to copyright protection.  Furthermore, the conduct at issue—the alleged conversion—consists entirely of defendants' alleged distribution of the print without authorization and without payment to Jalbert.  The conversion claim thus seeks to protect plaintiff's right of distribution, which is equivalent (if not identical) to the right protected by the Copyright Act.  *See Quincy Cablesystems, Inc., v. Sully's Bar, Inc.*, 650 F. Supp. 838, 849-50 (D. Mass. 1986).[20]  Thus, plaintiff's conversion action based on defendants' alleged unauthorized distribution of the print is preempted.

---

[20] Plaintiff does not allege that the physical items taken had any intrinsic value other than the intellectual property portrayed.  In other words, he does not complain about the loss of the piece of paper, but the loss of the design printed on the paper and the opportunity to profit from the sale of the design.

Accordingly, the Court will grant summary judgment in defendants' favor as to Count Three.

### E. **Count Four—Unfair and Deceptive Trade Practices (Mass. Gen. L. ch. 93A)**

Count Four alleges that Grautski, Swihart, and Rogers Printing each committed unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A.  Specifically, plaintiff contends that the three defendants violated Chapter 93A by committing willful torts, including conversion and infringing plaintiff's copyright in the print.

The Chapter 93A claim is likewise subject to preemption.   Plaintiff makes no separate allegation of unscrupulous or unlawful behavior, instead basing the claim entirely on the alleged copyright violations and acts of conversion.  *See Tingley Sys. v. CSC Consulting, Inc.,* 152 F. Supp. 2d 95, 108-09 (D. Mass. 2001) (finding merely labeling conduct as unfair, immoral, unethical, or unscrupulous does not save a Chapter 93A claim from preemption).  The right plaintiff seeks to enforce pursuant to Chapter 93A—the right to distribute the print—is equivalent to the distribution right protected by the Copyright Act.  *See John G. Danielson, Inc., v. Winchester-Conant Props., Inc.*, 186 F. Supp. 2d. 1, 29 (D. Mass. 2002), *aff'd on other grounds*, 322 F.3d 26 (1st Cir. 2003).

Accordingly, summary judgment will be granted in defendants' favor as to Count Four.

**F.**     **Count Five—Negligent Supervision**

Count Five alleges that Grautski and Swihart are liable for negligent supervision of their employee, Norman Camire.[21] Plaintiff contends that both employers negligently allowed Camire to engage in the unlawful distribution of plaintiff's print.

Massachusetts recognizes a cause of action for negligent supervision of an employee. *See, e.g., Foster v. The Loft, Inc.,* 26 Mass. App. Ct. 289, 290-91 (1988). However, an element of such a claim is that "during the course of employment, the employer becomes aware or should have been aware of problems with the employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment." *Id.* at 291 (internal quotations and citations omitted).

Even assuming for present purposes that Camire committed conversion and copyright violations, there is no evidence in the record that either Grautski or Swihart had any information suggesting that Camire was likely to take copies of plaintiff's print or otherwise violate his copyright. Simply leaving copyrighted prints where an employee might have access to them, and steal them, is not enough. Grautski was not aware, nor did he have reason to be aware, that Camire took copies of the print until plaintiff notified Grautski about the prints. At that point, he investigated the disappearance of the prints and learned that Camire had taken them. Similarly, Swihart was not aware, nor did he have reason to be aware, of Camire's wrongdoing until plaintiff notified Swihart about the print. Swihart acknowledges that he saw the copies of the print on F&M Towing's premises, but at the time he had no reason to suspect any wrongdoing. In the absence of any evidence of the requisite degree of employer awareness, a claim for

---

[21] As noted, Camire was an employee of both Add-A-Sign and F&M Towing. Count Five also alleges that Grautski and Swihart negligently supervised themselves, as employees of their sole proprietorships; as to those claims, summary judgment will obviously be granted in defendants' favor.

negligent supervision cannot survive summary judgment.  *See Vicarelli v. Business Int'l, Inc.*, 973 F. Supp. 241, 246-47 (D. Mass. 1997).

Accordingly, summary judgment will be granted in defendants' favor as to Count Five.

**III.**   **Conclusion**

For the foregoing reasons:

1.   the motion of plaintiff Mario Jalbert for partial summary judgment against defendants Timothy Grautski, individually and d/b/a Add-A-Sign, Rogers Printing, and Lisa LeBlanc is DENIED;

2.   the motion of defendants Timothy Grautski, individually and d/b/a Add-A-Sign, Rogers Printing, and Lisa LeBlanc for partial summary judgment as to Count One is GRANTED in part and DENIED in part;

3.   the motion of defendants Timothy Grautski, individually and d/b/a Add-A-Sign, Rogers Printing, and Lisa LeBlanc for summary judgment as to plaintiff's claims of vicarious and contributory infringement under Count One, as well as Counts Two, Three, Four, and Five is GRANTED in part and DENIED in part;

4.   the motion of defendant Larry Swihart, individually and d/b/a F&M Towing Service, for summary judgment is GRANTED; and

5.   the motion of plaintiff Mario Jalbert for summary judgment against defendant Larry Swihart, individually and d/b/a F&M Towing Service, is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
Dated:  March 31, 2008                      United States District Judge